UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

EDIE TAYLOR,

        Plaintiff,

v.                                                            Case Number 06-13057-BC
                                                            Honorable Thomas L. Ludington

ALTERRA HEALTHCARE CORPORATION,
d/b/a Alterra Assisted Living Services, Inc.,

        Defendant.

_____/

## **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On July 5, 2006, Defendant Alterra Healthcare Corporation removed Plaintiff Edie Taylor's complaint from state court to this Court. Plaintiff filed a complaint against her former employer, alleging a violation of the Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.361 *et seq*. On June 15, 2007, Defendant filed the instant motion for summary judgment. The Court will deny Defendant's motion because a rational jury could find in favor of Plaintiff regarding whether Defendant's termination of Plaintiff's employment was causally related to her report to a state agency about patient care at the nursing home. Further, Defendant has not made an uncontested showing of a legitimate business reason for terminating Plaintiff's employment.

The Court has reviewed the parties' submissions and finds that the facts and the law have been sufficiently set forth in the motion papers. The Court concludes that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *Compare* E.D. Mich. LR 7.1(e)(2).

I.

Defendant previously employed Plaintiff as an at-will resident assistant at an adult foster care facility[1] in Saginaw, Michigan. Defendant hired her on December 7, 2005. On January 10, 2006, Plaintiff received a positive 30-day progress report from her supervisor, Estella Huron.

In late December 2005 or early January 2006, Plaintiff maintains that she called Defendant's internal 800 number to leave a message regarding her belief that one resident continued to complain of an "irritated bottom," a complaint that went unrectified. She also alleges that she made several reports to her supervisor from December 2005 to February 2006. These reports largely related to her concerns about that same resident. According to Plaintiff, her supervisor directed her to use Gold Bond powder, which Plaintiff claims she did, but the strong order and irritation allegedly continued, despite Plaintiff's purported continued efforts to bring the situation to her supervisor's attention. Plaintiff maintains that she later observed blood in that resident's underwear, although she states that she did not report that fact to her supervisor, believing nothing would be done. Plaintiff also claims that she reported a growing bedsore on the rear of another resident, which may have caused him to have difficulty sitting up. Additionally, Plaintiff recounts that she related her concerns to a nurse, Paula Ott, who was the health care coordinator. Plaintiff states that she felt this apparent lack of responsiveness to these residents' health conditions, despite her reports, was unacceptable.

Around 9:30 or 10 p.m. on February 6, 2006, after she left work, Plaintiff contacted the Michigan Department of Social Services (MDSS) to relate her concerns. The report of that

---

[1] The facility where Plaintiff worked had a unit for residents with Alzheimers and dementia and a separate unit for assisted living.

investigation, dated February 14, 2006, recites the belief of two resident assistants, a nurse, and of a resident himself that he was not neglected by employees of Defendant. The report cites Defendant for three violations, two of which pertain to Defendant's administrator's qualifications, with the remaining violation relating to recording information in residents' charts.

According to the nurse, she and Plaintiff's supervisor theorized that Plaintiff was one of the two employees who might have contacted Social Services. On February 14, 2006, the supervisor called Plaintiff into her office. In the course of their discussion, Plaintiff acknowledged that she contacted the MDSS. According to Plaintiff, she related to her supervisor her dissatisfaction with the supervisor's response to the unimproved health conditions of the two residents, despite Plaintiff's several reports on their situation to the supervisor. Plaintiff recounted how she felt she had followed all the internal steps to no avail. In her deposition, she described what she expressed:

> And I talked about, I told her about she want us to do our job, she should be doing her job, too. I said, Estella, you said if there's any problems we are to come and report top you. I've done that.
> I said, Estella, you supposed to be a leader. I say, I've heard you talking about patients here, I've heard you talk about the families here. I said, that's inappropriate. You shouldn't be carrying on like that. I say, I'm in this field because I care about people and I thought you were there because you cared about people. Evidently you're not carrying about people. You must be just here for a paycheck, and not the care.

*Plaintiff's Deposition*, Pl. Rs. Br., Ex. 1, pp.51-52 [dkt# 35-2]. On the same date as that conversation,[2] Plaintiff's supervisor provided another positive progress report after Plaintiff was employed for 60 days.

After that date, Plaintiff believed that her supervisor's demeanor toward her changed.

---

[2]Plaintiff's supervisor dated her signature as February 14, 2006, although the form also bears the date of February 7, 2006, which is crossed out.

Plaintiff alleges that her supervisor made her clean a bowel movement out of a carpet (rather than having the janitorial staff attend to it), required her to clean rooms that she had already cleaned, stripped beds already made by Plaintiff, had Plaintiff remake those beds, and changed her shifts.

On March 9, 2006, Plaintiff's doctor ordered her not to work for a week due to the stress she was under from her interactions with her supervisor, according to Plaintiff's deposition. Plaintiff's husband took the doctor's note to her supervisor, who approved the leave of absence through March 16, 2006.[3]

Defendant's leave of absence policy, in relevant part, provides:

> Every effort will be made to re-employ you in your former position upon your return from an authorized [leave of absence]. However, we cannot guarantee that your position will remain open in your absence. If there is no vacancy, you may be offered another opening as required by law or for which you are qualified, if available.

*Defendant's Employee Handbook*, Pl. Rs. Br., Ex. G, p. 17 [dkt # 30-8].

According to the declaration of Defendant's director of human resources, Cheryl Smith, Defendant purportedly had to hire two replacement resident assistants immediately, because Defendant "did not know for certain when [Plaintiff] would return to work." *Smith Declaration*, Dft. Br., Ex. H, ¶ 14 [dkt #30-9]. Specifically, those other two employees were hired on March 10, 2006 and March 13, 2006.

Plaintiff maintains that, on March 16, 2006, her supervisor telephoned her to instruct her not to return to work now that replacements were hired, allegedly because the supervisor did not know when Plaintiff was coming back from leave. Plaintiff claims that she challenged that point, because

---

[3]Because Plaintiff worked for Defendant for less than one year, she was not eligible for leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*.

the supervisor signed the leave form that contained the date on which she would return – March 17, 2006. Plaintiff states that the supervisor indicated that she would call back, but when she did, on March 22, 2006, she allegedly told Plaintiff that she was laid off due to a lack of work. According to Plaintiff, she knew of other employees who had quit working for Defendant during that same time period.

Plaintiff claims that, late in March 2006, Defendant's director of human resources told Plaintiff she would look into her situation. In April 2006, Plaintiff maintains that the director contacted her to indicate that Plaintiff could reapply. When Plaintiff attempted to do so, she states that her former supervisor refused to let her reapply and barred her from the premises.

II.

Under Federal Rule of Civil Procedure 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care*

*Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).

III.

In the WPA, Mich. Comp. Laws § 15.362 provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee . . . reports . . . verbally . . . a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false . . . .

"To establish a prima facie case, it must be shown that (1) the plaintiff was engaged in protected activity as defined by the Whistleblowers' Protection Act, (2) the plaintiff was discharged, and (3) a causal connection existed between the protected activity and the discharge." *Shallal v. Catholic Soc. Serv. of Wayne County*, 566 N.W.2d 571, 575 (Mich. 1997).

Because Defendant concedes the first two elements of the claim in its brief, for purposes of this motion, the central issue is the element of causation. Showing causation requires more than a coincidence in time. *West v. General Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003) (citations omitted). In *West*, the plaintiff offered evidence only that the termination followed his report to authorities. *Id*. at 472-474. The additional fact that his supervisors, who did not participate in the termination decision, treated his report as insignificant did not alter the court's analysis and conclusion that the evidence pertaining to causation did not withstand summary judgment. *Id.; see also Shallal*, 566 N.W.2d at 579 (finding no jury question where the plaintiff knew she would be terminated before she reported her supervisor)*; Roulston v. Tendercare, Inc.*, 608 N.W.2d 525, 530 (Mich. Ct. App. 2000) (finding a jury question existed where the employer fired the employee within hours of allegedly learning of his report to authorities and where the manager was red in the face, abrupt, and standing by while the employee packed to depart); *Henry v. City of Detroit*, 594 N.W.2d

107, 112 (Mich. Ct. App. 1999) (finding a jury submissible question where the plaintiff's employer, the police chief, expressed displeasure over the plaintiff's damaging deposition testimony and, within four months, required the plaintiff to choose between demotion and retirement); *Thompson v. Aramark School Support Serv., Inc.*, 490 F.3d 506, 510 (6th Cir. 2007) (finding a jury question on causation, where the plaintiff was repeatedly reprimanded for speaking at school board meetings and eventually terminated for not following the company policy of reporting concerns internally).

Beyond a *prima facie* case, the familiar burden-shifting analysis from employment discrimination cases applies. *Taylor v. Modern Engineering, Inc.*, 653 N.W.2d 625, 628 (Mich. Ct. App. 2002). That is, after the plaintiff makes out a *prima facie* case, the defendant has the opportunity to demonstrate a legitimate business reason for its employment action. *Id*. Thereafter, the plaintiff has the opportunity to rebut that contention by showing that the defendant's reason is pretextual. *Id*.

If the pretext stage is reached, then a court must consider whether the defendant acted with a mixed motive, i.e., with a legitimate business reason and a retaliatory motive. *Hopkins v. City of Midland*, 404 N.W.2d 744, 752 (Mich. Ct. App. 1987) (citation omitted). A court must then consider the following possible standards: "(1) whether participation in the protected activity played any part in the discharge, no matter how remote; (2) whether plaintiff's protected activity was a substantial factor in the discharge; (3) whether plaintiff's protected activity was the principal, but not sole reason for the discharge; or (4) whether the discharge would have occurred had there been no protected activity." *Id*.

Here, treating as established the first two elements of a *prima facie* case of a violation of the WPA, as conceded by Defendant for purposes of this motion, the Court concludes that a reasonable

jury could return a verdict for Plaintiff on the issue of causation. On the same day that the MDSS report issued, the supervisor called Plaintiff into her office and asked if Plaintiff had contacted the state agency. Plaintiff acknowledged that she had and proceeded to question her supervisor's performance. Despite a positive job review from that same date, Plaintiff maintains that her supervisor's approach to her shifted toward the negative and that her supervisor began to make her repeat tasks and, once, to clean up a bowel movement. Then, after approving Plaintiff's leave of absence, the supervisor promptly hired two new employees to fill her role. Although the leave of absence form clearly indicates Plaintiff's expected return date, the supervisor allegedly telephoned Plaintiff on the day before her projected return. Plaintiff claims that the supervisor told her not to come in – because Defendant had hired replacements, purportedly because Plaintiff's return date was unknown. According to Plaintiff, the supervisor called back with a different story the following week, explaining that Plaintiff had been terminated because of a lack of work. Additionally, despite the human resources director's statement that Plaintiff could reapply, Plaintiff maintains that the supervisor refused to let her reapply and barred her from the premises.

In light of *Henry* and *Roulston*, the Court determines that a jury submissible question remains regarding causation. Even if other facts could be presented (and, indeed, are available in the supporting exhibits), Defendant has not succeeded in showing that no rational jury could conclude that a causal relationship existed between Plaintiff's report to the MDSS and her termination five weeks later. Accordingly, the Court will deny Defendant's motion for summary judgment, because Plaintiff has offered much more evidence than mere temporal proximity to support a claim of a violation of the WPA.

Next, Defendant's argument about the lack of pretext is disingenuous. Defendant skips

directly to challenging Plaintiff for not offering evidence of a pretext in its termination decision, rather than squarely addressing the existence of a legitimate business reason for that decision. While Plaintiff may fall short on this point, neither has Defendant offered an uncontested basis for its employment decision. It asserts that the busyness of resident care required it to hire replacements – because it did not know "for certain" Plaintiff's return date. Yet Plaintiff's supervisor completed the form that listed the return date as within one week. Moreover, Plaintiff maintains that Defendant had regular turnover and that she knew of two employees who quit around that time. Accordingly, Defendant's proffered business reason is, at least, contested as to its truthfulness and legitimacy. Consequently, the Court will deny Defendant's motion for summary judgment in the absence of an uncontested legitimate business reason for terminating Plaintiff's employment.

IV.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [dkt #30] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 4, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 4, 2007.

s/Tracy A. Jacobs
TRACY A. JACOBS